**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-61946-CIV-ALTMAN**

**MY. P.I.I. LLC**,

*Plaintiff*,

*v.*

**H&R MARINE ENGINEERING, INC.** *and*
**K&G MARINE, LLC**,

*Defendants*.
_______________________________________/

**ORDER**[1]

The Plaintiff hired H&R to perform necessary maintenance and repairs on the Plaintiff's yacht. H&R, in turn, subcontracted with K&G to assist with those repairs. Unfortunately, while K&G was doing its work, one of the yacht's propeller shafts was damaged. The Plaintiff sued H&R and K&G[2] in admiralty, seeking (among other things) *both* the loss of its charter income *and* reimbursement for the wages it paid the crew during the yacht's detention. The Defendants now move for partial summary judgment as to those two kinds of damages—even as they concede that the Plaintiff's remaining damages claims (for the yacht's deterioration and the insurance deductible) should proceed to trial. Because we agree that awarding the Plaintiff both its lost income and its expenses would result in an unfair windfall, we grant the Defendants' motion for judgment on the wages claim. But the Plaintiff has adduced *just* enough evidence for its lost-income claim—and so, that portion of its damages case survives.

[1] With the Court's permission, the parties have submitted some of their filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of public record," S.D. FLA. L.R. 5.4(a), this Order has been filed publicly.
[2] Together, "the Defendants."

## THE FACTS[3]

The Plaintiff ("PII")[4] owns the M/Y Pure Insanity[5]—a motor yacht registered with the U.S. Coast Guard as a recreational vessel, *see* Plaintiff's SOF [ECF No. 113] ¶¶ 1–2, and endorsed for "coastwise trade," Certificate of Documentation [ECF No. 105-1] at 1. PII has only one member—James Leonardo. *See id.* ¶¶ 8–12. Leonardo also owns RES Exhibit Services, LLC ("RES"), which has chartered the Vessel over the years. *See id.* In other words, Leonardo owns two LLCs—the one that *owns* the Yacht ("PII") and a second that regularly *charters* it. *See id.*

Leonardo formed PII in 2012. *See id.* ¶ 16; Defendants' SOF ¶ 16. Around 2015, Leonardo began funding PII through RES. The funding worked something like this: RES would transfer money to Leonardo's personal bank account, and Leonardo would send that money to PII. *See* Plaintiff's SOF ¶ 28. Eventually, RES began funding PII directly—depositing funds from its bank account into PII's rather than using Leonardo's personal bank account as a go-between. *Id.* In this way, RES funded—and continues to fund—PII's operating expenses. *Id.* ¶ 34; Leonardo 10/20/2020 Cont'd Depo. [ECF No. 127-1] at 53:13–54:6 ("Q: At the end of the day, if I'm understanding this, the expenses incurred by MY. P.I.I. are paid by RES, correct, all expenses? A: Correct. . . . Q: But all of the crew wages are paid by RES, correct? A: No. They're paid from M.Y. P.I. The money is transferred from RES to MY.

---

[3] We'll (mostly) cite to the Plaintiff's Counter Statement of Material Facts ("Plaintiff's SOF") [ECF No. 113]. And, because the Defendants failed to respond to *any* of the *additional* facts asserted in the Plaintiff's SOF—*see generally* Defendants' SOF [ECF No. 106]; Defendants' Reply [ECF No. 127] (unaccompanied by any additional counter-statement of material facts)—we'll deem those additional facts "admitted" for purposes of resolving this Motion. *See* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply."). One last thing: We'll disregard the unpleasant fact that the Plaintiff's SOF is contained within its Response [ECF No. 113]—a clear violation of S.D. FLA. L.R. 56.1(b)(1), which requires that statements of material facts be filed *separately*.

[4] MY. P.I.I. LLC.

[5] The "Vessel" or "Yacht."

P.I."). PII credits the revenues it earns from RES's Pure Insanity charters towards the operating expenses RES remits to PII. *See* Plaintiffs' SOF ¶¶ 28–29, 34.

RES and PII also share an accountant—Jeffrey Jacobson, RES's Vice President of Finance. *See id.* ¶¶ 27, 31. Jacobson, along with several other RES employees, prepares and manages PII's General Ledger. *See id.* ¶ 31. When RES charters the Vessel, RES treats the charter costs as an expense, and PII registers the same amount as revenue. *See id.* ¶ 29. PII's General Ledger describes its charter income as "Due to/from Jim Leonardo." *Id.* ¶ 30. From 2014 through 2018, the Plaintiff chartered the Yacht approximately five to eleven weeks each year at a daily charter rate of $12,857.14. *Id.* ¶¶ 22, 34.

But PII doesn't offer the Pure Insanity to the general public. Leonardo 4/27/2020 Depo., Ex. 2 [ECF No. 105-2] at 124:8–9 ("A: I don't typically do charter activity with just random people."). Instead, to defray some of the Yacht's costs, PII charters it to Leonardo's friends, acquaintances, and business associates. *Id.* at 124:9–17 ("A: This [chartering] was a move to substantiate some of the cost and sustain some of the costs overall with it. The bottom line is, seeing that the yacht hadn't been used in that time, it was like, all right, let's take up a charter on it and see if we can create some of the revenue. We didn't do it with the general public. We do it through the—no different than I did with IGI.").[6]

In 2018, while aboard the Pure Insanity, AJ Nassar—Leonardo's business acquaintance—told Leonardo that he wanted to charter a yacht from May 25 to June 4, 2019, and he asked Leonardo how much the Pure Insanity would cost. *Id.* at 111:3–112:11, 119:18–120:2. Leonardo sent Nassar a one-page proposal for those dates, which included the Yacht's daily charter rate. *Id.* at 112:9–114:2, 123:5–10 ("Q: [I]n response to oral conversations that you had with Mr. Nassar when he expresses an interest

[6] IGI, which provides IT and network services to RES, has chartered the Pure Insanity. *See* Leonardo 4/27/2020 Depo. at 23:25–25:20. And Leonardo has no ownership stake in IGI. *Id.* at 23:23–24.

in chartering the Pure Insanity, you send him a one-page proposal towards the end of 2018, correct? A: Correct.").

In 2019—after Nassar had expressed interest in chartering the Pure Insanity—PII hired H&R to perform whatever maintenance might be necessary for the Vessel's five-year American Bureau of Shipping ("ABS") inspection (sort of like your car's registration) and to conduct any needed repairs to the running gear (which includes the Yacht's propellers, shafts, couplings, rudders, and cutlass bearings). *See* Plaintiff's SOF ¶ 3; *see also* Am. Compl. [ECF No. 22] ¶ 8. While H&R was removing the Vessel's port coupler—an essential link between a yacht's propeller shaft, its transmission, and its engine—H&R breached the coupler's seal. *See* Plaintiff's SOF ¶¶ 4–5. Because of the breach, the coupler could no longer maintain the pressure that's required to remove it from the propeller shaft's sleeve. *See id.*; Defendants' SOF ¶ 5. Looking to remedy the problem, H&R hired K&G to cut the port coupler—to the sleeve—so that H&R could then remove it. Defendants' SOF ¶¶ 5–8; Plaintiff's SOF ¶¶ 5–8. In the process of cutting the port coupler, however, K&G (accidentally) penetrated the port coupler's sleeve and cut into the port propeller shaft itself—a cut that required further repairs. *See* Plaintiff's SOF ¶¶ 5–8. As a result, for the next six-and-a-half months,[7] from the date of the accident—March 11, 2019, *see* Defendants' SOF ¶ 7—through approximately September 30, 2019, the Vessel underwent repairs "on the hard"—that is, out of the water, *see* Leonardo 4/27/2020 Depo. at 123:12–19 ("A: Okay, at that time we thought it was going to be five weeks or six weeks. It turned

[7] While the Plaintiff appears to seek loss-of-use damages for the six-or-so months between March 11, 2019 and September 30, 2019, the Yacht itself wasn't operational for about ten-and-a-half months in 2019. *See* Leonardo 4/27/2020 Depo. at 17:3–11 ("A: 2019 [the Vessel] remained on the hard for almost ten months. . . . The boat was not in the water for over ten months."); 144:3–7 ("Q: In the year 2019 you mentioned that RES did not charter the Pure Insanity. You pointed out it was ten and a half months or so not functioning. So RES didn't charter the Pure Insanity in 2019, correct? A: There's no sales, correct."). We don't really understand this discrepancy, so we'll just stick to what the Plaintiff is asking for.

into five or six months.").[8] And, of course, since the Yacht wasn't operational, Nassar wound up chartering a different vessel. *See, e.g.*, *id.* at 120:22–25 ("A: . . . the bottom line is they ended up using another vessel[.]"), 126:25–127:9.

In its Amended Complaint, PII asserts six causes of action: breach of contract against H&R (Count I); breach of implied warranty against H&R (Count II); negligent supervision against H&R (Count III); breach of third-party beneficiary contract against K&G (Count IV); breach of implied warranty against K&G (Count V); and negligence against K&G (Count VI). *See* Am. Compl. ¶¶ 16–44. As redress, PII asks for several things: (1) lost charter income; (2) reimbursement for the crew's wages; (3) compensation for damages to the boat (including ultraviolet degradation); and (4) its insurance policy's deductible. *See id.* At issue here are the first two of these claims: lost income and crew wages. The Defendants have jointly moved for partial summary judgment, arguing that the Plaintiff isn't entitled to either. *See* Defendants' Motion for Summary Judgment ("Motion") [ECF No. 105] at 2.[9] This Order follows.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

[8] *See also* Leonardo 4/27/2020 Depo. at 131:12–17, 135:21–25 ("Q: Do you know what dates in March and what dates in September [the crew's wages] w[ere] calculated through? It looks like the lost charter was March 11th through September 30th. Do you know if that's the same day it was used for crew losses or crew pay?").

[9] The Motion is now ripe for resolution. *See* Response [ECF No. 113]; Reply [ECF No. 127].

An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also* Celotex *Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed

to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

### I. Loss of Use

### A. PII Has Done Just Enough to Survive Summary Judgment

A plaintiff may not seek redress in admiralty for "a mere inconvenience arising from an inability to use the vessel for the purpose of pleasure." *The Conqueror*, 166 U.S 110, 133 (1897). Instead, a maritime plaintiff must show "a loss of profits in its commercial sense." *Id.* In other words, a plaintiff "is entitled to receive loss of use damages only if able to prove, with reasonable certainty, that profits had actually been, or may reasonably be supposed to have been, lost." *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000) (citing *The Conqueror*, 166 U.S. at 125–33).

"The general measure of the economic loss of a vessel during detention is net profit. The contract rate for rental of the vessel is a proper guide for measuring the lost income of the shipowner." *Skou v. United States*, 478 F.2d 343, 347 (5th Cir. 1973);[10] *accord The Conqueror*, 166 U.S. at 133 ("In all the cases in which we have allowed demurrage, the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was determined either by the charter value

[10] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

of such vessel or by her actual earnings at about the time of the collision.").[11] So, "damage to the owner can be computed by calculating the lost charter hire and deducting any savings to the owner attributable to the ship's being out of service[,]" *Skou*, 478 F.2d at 347 (cleaned up), such as savings on crew wages or fuel expenses. But "[w]here the shipowner makes no savings of operating expenses during repairs the charter price is an adequate measure of damage." *Id.* However the court calculates damages, the "burden is upon the shipowner to prove the extent of damages actually sustained by him." *Id.*

In *The Conqueror*, U.S. Customs officials wrongfully detained the plaintiff's pleasure yacht for just over five months. 166 U.S. at 125. The plaintiff sued the Collector of Customs at the Port of New York[12] to recover for loss of the boat's use during that time. *Id.* After the district court awarded the plaintiff its loss-of-use damages, the Supreme Court reversed. *Id.* at 134. In doing so, the Court found the plaintiff's testimony "wholly indefinite and unsatisfactory" insofar as "the only evidence of loss of profits was that of three witnesses" who'd offered *only* their *opinions* about the reasonable value of the

[11] Courts often use the term "demurrage" when referring to "an award for actual profits lost during the detention necessary to make repairs" to a vessel that's been damaged by the fault of another. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 14:7 (6th ed. Nov. 2020 update). But "[t]he term demurrage technically is the contractual sum given a shipowner for the use of his ship beyond the time fixed by a charter party," whereas an award for actual profits lost during detention "is known variously as loss of use or detention damage." *Id.* (citing *The Potomac*, 105 U.S. 630, 631–32 (1881)). In the interest of precision and clarity, then, we'll use "loss of use," "lost profits," or "detention damages" in place of "demurrage."

[12] In 1897, when *The Conqueror* was decided, the Collector of Customs at the Port of New York, also known as the Collector of the Port of New York (or, for short, the Collector of the Port), oversaw the collection of customs duties in that state. *See* DEP'T OF HOMELAND SECURITY, CELEBRATING 227 YEARS OF THE US CUSTOMS SERVICE (Aug. 1, 2016), https://www.dhs.gov/blog/2016/08/01/celebrating-227-years-us-customs-service. The Collector was a "prize plum" position—a presidentially appointed, senate-confirmed officer of the U.S. Customs Service ("USCS"). *Open Season Now for Job Hunters: Local Republican Leaders Preparing to Fill Offices under New Administration*, N.Y. TIMES (Nov. 9, 1920), https://timesmachine.nytimes.com/timesmachine/1920/11/09/103486151.pdf. Eventually, though, the customs "collector" was recast as a customs "commissioner," which is how we refer to the post today. *See* DEP'T OF HOMELAND SECURITY, *supra*.

yacht's use—without any *facts* to support their estimates. *Id.* at 130. As the Supreme Court explained, the plaintiff had purchased the yacht "for his personal pleasure, and there [wa]s not an atom of testimony tending to show that he bought [the yacht] for hire, or would have leased [it] if he had been able to do so." *Id.* at 134–35. The Court did note that the boat was detained mostly during the offseason and acknowledged "a possibility that [its] owner might have desired [the yacht] for use in a winter's cruise to tropical waters," but added that "there was not the slightest evidence of that, and the contingency of her being used was too remote to justify an allowance upon that basis." *Id.* at 134. In the Court's view, in other words, the plaintiff had offered no evidence that he would've chartered the yacht during its five-month detention.

*The Conqueror* thus barred recovery for "a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure[.]" *Id.* at 133. But it allowed admiralty plaintiffs to recover for the loss of their vessels' use so long as they could show "actual loss, and reasonable proof of that amount." *Id.*; *see also Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170, 175 (1932) (interpreting *The Conqueror* as "h[olding] that recovery was excessive when based on the returns of an imaginary letting" and noting that loss of use "on the basis of the cost of a substitute, actual or supposititious, may be no more than fair indemnity when gains have been lost *or* enjoyment seriously disturbed" (emphasis added)).

The Eleventh Circuit, like the Old Fifth Circuit, has interpreted *The Conqueror* as authorizing detention damages only when "profits had actually been, or may reasonably be supposed to have been, lost[.]" *Cent. State Transit & Leasing Corp.*, 206 F.3d at 1376 (quoting *The Conqueror*, 166 U.S. at 125); *see also Bolivar Cty. Gravel Co., v. Thomas Marine Co.*, 585 F.2d 1306, 1307 (5th Cir. 1978) (affirming the district court's denial of loss-of-use damages because there was "no evidence that the plaintiff lost any sales, revenues, or potential customers, nor is there any evidence that it incurred any increased operating expenses"); *Skou*, 478 F.2d at 345 (same). In this Circuit, then, *The Conqueror* and its progeny

preclude admiralty plaintiffs from pursuing detention damages on a vessel that's only ever been deployed for personal use.

But what about boats that are put to multiple uses—some personal, some commercial? In such cases, courts typically examine the *kind* of use, rather than the registration, to determine the viability of the plaintiff's damages claim. Although the Eleventh Circuit hasn't squarely addressed this scenario, other circuits have interpreted *The Conqueror* as "not purport[ing] to bar the owner of a multipurpose vessel from recovering damages attributable to lost business use." *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 40 (1st Cir. 2017).[13] In *Sharp*, for instance, the First Circuit affirmed the trial court's decision to award the plaintiff loss-of-use damages, even though the plaintiff's yacht had been registered only for recreation and was chartered *only after* the plaintiff sued. *Id.* The seventy-foot pleasure craft at issue in *Sharp* was insured only for noncommercial, private use, and the plaintiff had never taken a business deduction on it. *Id.* at 41. But the plaintiff had formed a limited liability company "prior to closing on and taking possession of [the yacht] Destiny—because he was going to charter the yacht, so he wanted to put it into, essentially, a corporate shell." *Id.* (cleaned up). And the court accepted the plaintiff's testimony that yachts "are very expensive to maintain, and [that] he did not plan to live his life at sea, so he intended from the start to charter the yacht during the extensive amount of time each year that he himself would be unavailable to sail." *Id.* at 41.

The Ninth Circuit has likewise allowed plaintiffs to recover loss-of-use damages in cases involving mixed-use vessels. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 863–65 (9th Cir. 2011) (affirming district court's award of hotel fees plaintiff incurred while awaiting repair of his boat, which

[13] In *Sharp*, the court "assume[d], without deciding, that *The Conqueror* applies fully to plaintiffs' claims; hence, Sharp cannot recover damages for lost pleasure use of a pleasure vessel" because neither party had argued for the application of federal maritime law and because neither party objected to the district court's determination that "plaintiffs are not entitled to any damages based on any loss of use for recreational purposes." 872 F.3d at 39 (cleaned up).

he used as a second home). In *Oswalt*, the plaintiff owned "a 42 foot long Krogen pleasure boat" that caught fire while undergoing repairs to its burner unit. *Oswalt v. Resolute Indus., Inc.*, 2010 WL 88989, at *1 (W.D. Wash. Mar. 10, 2010). In their suit against the repairman's employer, the plaintiff and his insurer sought (among other things) damages for their loss of the vessel's use. *See Oswalt*, 642 F.3d at 859. The Ninth Circuit affirmed the district court's award of loss-of-use damages because the plaintiff worked as a flight attendant and used the boat "as a second home when working in Oakland, California in the winter months." *Id.* at 864. Since the fire had happened when the boat "was being readied to take to Oakland for the winter," the plaintiff was "[u]nable to use the [boat] as his residence" while he was working out of Oakland—and, as a result, he "incurred hotel expenses." *Id.* These expenses, the court held, were "both business-related and entirely nonspeculative" in that they were "supported by extensive, uncontroverted documentation." *Id.* at 865.

It's worth noting, too, that other "[c]ircuit courts have, in turn, adopted a rule allowing owners of multipurpose vessels to recover detention and demurrage damages where owners can show with 'reasonably certainty' that those damages arose from lost business use rather than lost pleasure use." *Sharp*, 872 F.3d 31, 40 (1st Cir. 2017) (citation omitted).

With this framework in mind, we turn to the Defendants' Motion. In the Defendants' view, the Plaintiff has failed to show *any* lost charter income. *See* Motion at 3, 5–7. In particular, as far as the Defendants are concerned, the Plaintiff hasn't established (1) that the Vessel was used for a commercial purpose, (2) that the Vessel generated a profit, or (3) that it would be expected to earn a profit in the future. *See id.* In this respect, the Defendants note—and the Plaintiff doesn't dispute, *see* Plaintiff's SOF ¶ 2—that the Yacht is registered as a *recreational* vessel, *see* Motion at 5.[14] But, as we've explained, the viability of the Plaintiff's loss-of-use claim turns on the nature of the Yacht's *use*—not

[14] That said, as we'll see in a moment, the Vessel is also permitted for limited "coastwise trade." *See infra* note 23.

its registration. And the Plaintiff *has* adduced evidence that, from 2014 through the 2019 repairs, it chartered the Vessel commercially on a fairly regular (if not entirely consistent) basis. *See* Ex. A, Leonardo Decl. [ECF No. 113-1 at 2–4] ¶¶ 8–14 ("[T]he Vessel was used by RES Exhibit Services, LLC to perform charters with Bushnell corporation and Northrop Grumman, Infinite Group, Inc., Leidos Defense Group, Ainsworth Game Technology, Lockheed Martin, Scientific Games Corporation, Textron, Rockwell Collins, and AGFA, amongst others. . . . Additionally, the Vessel was also chartered in the past to a third party named Infinite Group, a/k/a IGI."). Indeed, the record evidence shows that PII chartered the Yacht for 36 days in 2014, 43 in 2015, 50 in 2016, 59 in 2017, and 69 in 2018. *Id.*, Ex. 1, 2014–2018 Chartering Activity [ECF No. 113-1 at 6–13]. These charters, in turn, brought PII $462,857.04 in 2014, $552,857.14 in 2015, $642,956.16 in 2016, $758,571.08 in 2017, and $887,142.66 in 2018. *Id.*

Nor does the Plaintiff rely only on generalized annual income. As we've said, Leonardo specifically testified that a business associate named AJ Nassar—who had been on the Yacht at least once before—wanted to charter the Yacht between May 25 and June 4, 2019. *See* Plaintiff's SOF ¶ 23 ("There was also a gentleman by the name of AJ Nassar who intended to charter the Vessel in 2019, but ultimately was unable to as a result of the Vessel's unavailability due to the damaged shaft. Mr. Nassar would have been charged the prevailing rate as noted above for May 25th through June 4, 2019.").[15] After Nassar asked Leonardo about the charter's cost, Leonardo sent Nassar a one-page,

[15] *See also* Leonardo 4/27/2020 Depo. at 111:17–21 ("Q: So [Nasar] was looking to charter a vessel for that, I guess looks like about maybe not quite a two-week period, May 25th to June 4th, 2019, he was looking to charter a vessel then? A: A ten-day period, yep."); *id.* at 112:1–11 ("Q: Are you saying that he also sought a quote from you to charter the Pure Insanity during that same time period? A: Correct. Q: When did he seek that quote from you? A: Back the end of the year in 2018. I'm not certain of the exact date. Q: Okay. Did you submit a quote to him? A: We did a one-page proposal that basically just had the dates to it, not a formal charter agreement."); *id.* at 119:18–120:2 ("Q: [W]hen did you first speak to Mr. Nassar about chartering the Pure Insanity? A: Probably midyear in 2018. A: And did you provide a quote then, or no? A: No. The verbal conversation on the vessel, on Pure

written proposal for the requested dates, which included the Yacht's daily charter rate. *Id.* at 114:13–22 ("Q: Do you have a specific recollection as we sit here today of having seen that one-page proposal? A: Yes. Q: Do you remember how much it was for? A: Again, we based the rates on around $12,000 a day. So I figure it's very close to this in dollars. That's what we will find on those documents that we are going to provide you for the years. I think we use a rate of $12,750 a day. So very close to where this is. I don't know the exact number, though.").[16] Unfortunately, because the Yacht was damaged and under repair, Nassar was forced to go elsewhere for his charter. *See, e.g.*, *id.* at 126:25–127:9 ("A: [T]he understanding was he was going to charter it at all times to that point when it was in for maintenance. We continued to talk about it, and finally, while it was in maintenance and we knew we were having problems at one point, I'll say sometime in March, whether it be late March or February to March, I had said to him, AJ, this is not going to work from that perspective. We are going to be out of the water longer than anticipated, okay?"). That Nassar engaged Leonardo in discussions about the Yacht's charter, that Leonardo responded to those discussions with a written proposal—which included both specific dates and specific pricing—and that Nassar ultimately did hire a separate yacht for the dates in question is (we think) sufficient, at *this* stage of the case, to establish that "profits have actually been, or may be reasonably supposed to have been, lost[.]" *Cent. State Transit & Leasing Corp.*, 206 F.3d at 1376 (quoting *The Conqueror*, 166 U.S. at 125). Remember, the standard "that a shipowner offer proof of loss is not equivalent to a requirement that he prove the loss of a specific charter at a definite time and place." *Skou*, 478 F.2d at 346. A shipowner may satisfy his obligations "if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so,

Insanity. Q: All right. And then you think you provided a written quote today [sic] the end of the year 2018? A: Yes.").

[16] *See also id.* at 123:6–10 ("Q: [I]n response to oral conversations that you had with Mr. Nassar when he expresses an interest in chartering the Pure Insanity, you send him a one-page proposal towards the end of 2018, correct? A: Correct.").

and that he would have availed himself of it." *Id.* (cleaned up) (quoting *The North Star*, 151 F. 168, 175 (2d Cir. 1907). PII has done precisely that.

**B. The Defendants' Arguments Are Unpersuasive**

Against all this, the Defendants marshal five principal arguments—all unavailing.

**1. Disputing the Nassar Story**

*First*, they question whether this whole business with Nassar ever occurred. *See* Reply at 4–5.[17] In support, they note that Leonardo hasn't supplied any proof of *either* his discussions with Nassar *or* the written proposal he purports to have sent. *See* Motion at 6. In this, the Defendants may be right—so right, in fact, that they may one day prevail on this question at trial. But we aren't at trial; we're at summary judgment. And, at this phase of the case, the Court cannot weigh the evidence or engage in credibility determinations. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment."). Leonardo has told us his side of the story and, for now anyway, we must take him at his word. *See, e.g.*, *United States v. Stein*, 881 F.3d 853, 856–57 (11th Cir. 2018) (en banc) (noting that "a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment"); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021) ("A non-conclusory affidavit which complies with Rule 56 can create a genuine dispute concerning an issue of

[17] By not advancing this argument in their Motion, the Defendants have waived it. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("[a]rguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

material fact, even if it is self-serving and/or uncorroborated." (cleaned up) (quoting *Stein*, 881 F.3d at 858–59)).

**2. The Shell Theory**

The Defendants next say that, "as a matter of law," PII cannot recover detention damages because *Leonardo* uses the Vessel as "a tax shelter that allows him to offset the expenses and losses associated with operating the vessel against his income on his personal tax return." Motion at 3–4. Leonardo, the Defendants note, admitted at his deposition that "the payments of the charters for Pure Insanity are paid by one company that [he] own[s] to another company that [he] own[s]." Leonardo 4/27/2020 Depo. at 16:11–14. In the Defendants' view, since Leonardo owns both PII and RES—and given that all the money PII earns comes from RES—"the resulting impact on the pre-tax earnings of the two businesses offset one another." Motion at 4–5.[18] And, the Defendants add, this "offsetting effect flows down to Leonardo's personal income tax return." *Id.* The "net income impact to Leonardo," in other words, "is zero"—a fact that, so far as the Defendants are concerned, precludes PII from pursuing its lost profits. *Id.* at 5. For three reasons, we disagree.

*First*, PII, RES, and Leonardo are three distinct entities. So, while the Defendants may be right that "taxable income would be zero on [Leonardo's] tax return[,]" that "only impacts [Leonardo's] tax return [and] amount of income tax that he will pay." Bruckel Depo. [ECF No. 127-2] at 52:10–13. But "MY. P.I.I. is an entity that owned the boat and has to pay its own bills. Has to pay its loan obligations. Needs to generate revenue to do that. In order to generate revenue to do that it needs to charter the

[18] For what it's worth, Thomas Bruckel (PII's CPA) agreed with this general proposition. *See* Bruckel Depo. [ECF No. 127-2] at 44:2–45:5 ("Q: Any revenues earned by MY. P.I.I. through their provision of chartering services to RES represented equal operating expense to RES. Do you agree with that? A: But for the term operating expense I would say, yes, RES would be incurring an expense. . . . Q: The resulting impact on the pre-tax earnings of the two businesses offset one another. Do you agree with that? A: For the billing and the – For the billing, yes. Billing and the expense. The revenue generation, the expense, that's true.").

boat." *Id.* at 52:14–17. The Defendants could've argued that PII, RES, and Leonardo are indistinguishable from one another and that, as such, the Court should pierce PII's corporate veil and take the three parties' profits and losses together; it could have moved to join RES and Leonardo as plaintiffs in the case; and, if joinder were unfeasible, it could have asked the Court to dismiss the case under Rule 19(b), citing for its (hypothetical) motion the indispensability of RES and Leonardo. Indeed, presaging these possibilities, the Plaintiff, in its Response, outlined Delaware law on the doctrine of veil piercing and argued that veil piercing would be inappropriate in the circumstances presented here. *See* Response at 12–19. But, rather than accept the Plaintiff's invitation, the Defendants (curiously and in Reply) insisted that they were advancing *no* veil-piercing arguments at all. *See* Reply at 3 ("The legal concept of piercing the corporate veil is *irrelevant* to the analysis of Plaintiff's charter income claim[.]" (emphasis added & cleaned up)). In so doing, of course, the Defendants have waived any veil-piercing arguments they might've made and are stuck with what they have: one Plaintiff (PII) whose net losses, such as they are, cannot be discounted by reference to the losses or gains of some other company's (or person's) ledgers.

*Second*, the Defendants' argument ignores the Plaintiff's evidence of *other* charterers besides RES. Most obviously, the Defendants ignore Leonardo's testimony about the missed Nassar charter—which, so far as we can tell, had *nothing* to do with RES. *See, e.g.*, *supra* note 15.[19] Here, again, the Defendants take aim at the long-established rule that a plaintiff should be permitted, at summary judgment, to stand on his own self-serving declarations. If, the Defendants complain, "this type of evidence were legally sufficient, any vessel owners would be able to recover for loss of use by simply alleging verbal contracts existed." Reply at 4. But we needn't follow the Defendants down the slippery

[19] *See also* Leonardo 4/27/2020 Depo. at 118:25–119:8 ("Q: How do you know Mr. Nassar? A: I leased a space from him in an auto vault in Fort Lauderdale. Q: I'm sorry. I missed that. You said you leased a space from him? A: I lease a space from him in an auto vault, a building that is an auto vault where there are several people that have a specific amount of space to store vehicles in.").

slope they've brought us to. Nor need we play along with the if-this-then-the-deluge hypothetical they've set for us. No one is suggesting that Leonardo's largely uncorroborated (and self-serving) testimony should allow the Plaintiff, without more, "*to recover* for loss of use." We're simply saying that "a litigant's self-serving statements based on personal knowledge or observation can defeat *summary judgment*." *Stein*, 881 F.3d at 857 (emphasis added) (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). Whether Leonardo ultimately prevails is, of course, a question for trial.

*Third*, the Defendants cite *not a single case* for their position that Company A, which earns money by chartering its vessel to Company B, cannot recover lost income when the same individual C owns both companies. The "Defendant's failure to cite *any* authority for this principle makes it difficult for the Court to rule in its favor." *Belony v. Amtrust Bank*, 2011 WL 2297669, at *2 (S.D. Fla. June 8, 2011) (Marra, J.); *see also id.* (noting that the "Defendant's deficient memorandum of law is itself a basis to deny its motion"); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). We judges should be expected to work hard—yes; and, it's true, we benefit, to an almost embarrassing degree, from the substantial resources Congress has allotted us—chief among these, our law clerks. But these two ingredients—smart law clerks[20] and a penchant for hard work—do not oblige us to do the lawyers' jobs as well as our own. The law demands that lawyers present their clients' cases with argument *and* citation. It doesn't—nor should it—permit lawyers to fling whatever arguments they might conjure (however far-fetched or frivolous) at the judge in the hopes that, by a prodigious use of a Westlaw account, that intrepid judge (and his smart law clerk) might find the one case that stands in support

[20] *But see* MIGUEL DE CERVANTES, DON QUIXOTE 214 (J.M. Cohen trans., CRW Publishing Ltd. 2006) (1947) ("But do not give it to a lawyer's clerk to write, for they use a legal hand that Satan himself will not understand.").

of their proposition. If the Defendants want to re-raise this argument at trial, in other words, they may do so—but only if they find some support for it.

**3. Net Profits**

Moving along, the Defendants aver—and the Plaintiff's records show—that the Vessel operated at an annual net loss, albeit a decreasing one, from 2015 to 2018. *See* Motion at 6 (citing Leonardo 4/27/2020 Depo. at 30:2–7); Jacobson Decl., Ex. 1 (PII Profit and Loss Statement) [ECF No. 113-1] at 19–20; PII Schedule C Tax Returns 2012–2018 [ECF No. 112-1]. Interpreting *The Conqueror* and its progeny as holding that a loss-of-use plaintiff can only recover his "*net profit*," the Defendants contend that PII should be precluded from pursuing its detention damages because it only ever operated at a loss. *See* Motion at 6 (noting that PII "has never earned a profit, which is the legal basis of recovery for loss of use."). But there are two problems with this argument.

*One*, the Plaintiff's losses *in previous years* do nothing to undermine the force of the Nassar story—the premise of which (again) is that, had the Defendants not damaged the Plaintiff's Yacht, a wealthy business associate of Leonardo's would've paid PII a not-insignificant sum of money to charter the Yacht in 2019. At the very least, then, the Plaintiff should be entitled to pursue those Nassar damages from 2019, whatever losses it sustained in previous years.

*Two*, it's true that "[t]he general measure of the economic loss of a vessel during detention is net profit." *Skou*, 478 F.2d at 347. But—warning: what follows may be confusing—the term "net profit" in this context doesn't appear to mean what the Defendants think it means. In *Skou*, the Old Fifth Circuit defined "net profit" by reference to "[t]he contract rate for rental of the vessel"—which, the court explained, "is a proper guide for measuring the lost income of the shipowner." *Id.* How (the Defendants may be wondering) can that be? How (in other words) can "net profit" equal "the contract rate," which is just another way of saying "gross revenue?"

The simple answer is that *net* profit just means the *gross* charter price *minus* any operating expenses the plaintiff *saved* because of the boat's detention. As *Skou* made clear: "From a gross charter price, must be subtracted the ordinary expenses the shipowner would incur *in earning that gross fee*." *Id.* (emphasis added). On the other hand, "[w]here the shipowner makes no savings of operating expenses during repairs *the charter price* is an adequate measure of damage." *Id.* (emphasis added). And, by the way, this definition accords nicely with the Supreme Court's own description of what it meant by "loss of profits." *The Conqueror*, 166 U.S. at 133 ("In all the cases in which we have allowed demurrage, the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was determined either by *the charter value of such vessel* or by her actual earnings at about the time of the collision." (emphasis added)).

If we think about it, this all makes sense. Imagine a yacht owner who, but for the defendant's negligence, would've chartered his yacht to a client for $100. Imagine, too, three distinct cost scenarios for the period of the yacht's charter. In Scenario A, the yacht's expenses are $150. In Scenario B, they're $100. In Scenario C, they're $50. Suppose, lastly, that the owner's costs are fixed—*i.e.*, that they'd be the same whether the yacht was under charter or on land. If what we're solving for is the *loss* the owner suffered as a result of the defendant's negligence, then the expenses in each of these three scenarios should be irrelevant to the computation of the owner's damages. That is, the defendant should be compelled to make the owner whole by paying him, in each scenario, $100 *without* regard to the (immaterial) amount of the owner's fixed expenses. To put a number on it: but for the defendant's negligence, the owner would have *netted* (with revenues paid by the charterer) -$50 in Scenario A, $0 in Scenario B, and $50 in Scenario C. And our admiralty law should ensure that, if his lawsuit is successful, our owner will *net* (with indemnity from the defendant) those very same amounts in each scenario. That, of course, is precisely what we mean by damages that are meant to be compensatory.

The Defendants' definition of "net profit," by contrast, makes little sense. For one thing, the Defendants' interpretation would fail to make the Plaintiff whole. And, generally speaking, the law endeavors to put plaintiffs in the same position they would've been in had the defendant not harmed them. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 254–55 (1978) ("The cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty." (cleaned up) (quoting 2 F. HARPER & F. JAMES, LAW OF TORTS § 25.1 (1956))); *cf. Marbury v. Madison*, 5 U.S. 137, 166 (1803) ("But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy."). No less problematic, the Defendants' reading of *The Conqueror* and *Skou* would treat plaintiffs *differently* based only on a factor (expenses) that's orthogonal—and, in fact, irrelevant—to the litigation. To see why, we need only review the three scenarios we've outlined above. As we've shown, the law treats the owner in each scenario exactly the same. But, in the Defendants' world, the owner in Scenario C would receive $50, while the owners in Scenarios A and B would receive $0—even though the *amount of the damage the defendant caused* was the same. This cannot be the law—and, fortunately, it isn't. And it's for this reason that we subtract from the charter price any amount the plaintiff *saved* as a result of the detention. This final caveat is crucial to understanding the scope of the "net profits" computation because it underscores that the problem we're solving for is remediation—ensuring that the plaintiff receives *only* what he lost by the defendant's negligence, no more and (just as critically) no less.

In our case, then, we have a plaintiff who continued to pay the Yacht's full operating expenses—including the crew's wages—during the detention. *See, e.g.*, Leonardo 4/27/2020 Depo. at 180:13–17 ("Q: So the fact of the matter is that the crew wages that you pay from March through September of 2019 would have been the exact same crew wages that you would have paid had this shaft never been cut, correct? A: Correct."). Since the Plaintiff thus saved *nothing* from the Yacht's

detention, "the charter price" (or, to use *The Conqueror*'s phraseology, "the charter value") is the proper measure of the Plaintiff's detention damages.

**4. The Defendants' Reliance on *Finkel***

*Fourth*, the Defendants liken our case to *Finkel v. Challenger Marine Corp.*, 316 F. Supp. 549 (S.D. Fla. 1970); *see* Motion at 6–7. *Finkel* involved a yacht that was damaged as the defendants were transporting it to the plaintiff in Bimini. 316 F. Supp at 551. The plaintiff recovered the cost of the repair from the insurance company and sued the defendants for loss of the yacht's use. *Id.* at 553–54. At *trial*, the plaintiff "contend[ed] that he had entered into certain charter agreements with a group of six friends whereby each of them was to charter the yacht for a one-week period at a weekly charter hire of $2,000." *Id.* at 554. But, after reviewing the contracts, hearing the testimony, and adjudging the plaintiff's credibility, the court wasn't persuaded. In its view, the charter agreements were conveniently for the "exact amount of time that was actually required to repair and refinish the yacht, in accordance with plaintiff's instructions." *Id.*. In other words, the court concluded that the plaintiff's testimony about the validity of these charter contracts "simply d[id] not ring true[.]" *Id.* at 555. In explaining its decision to discredit the plaintiff's evidence, the court noted that the "purported charterers were close friends, neighbors, or business associates of the plaintiff *and* all were entered into within a very brief period of time early in April 1969[.]" *Id.* And, the court added, "[n]one of these persons appeared either in person or by deposition in support of the plaintiff's contention as to the validity of these charters." *Id.* Most suspiciously, the agreements "were all identical in terms" and failed to specify whether they were for "bare boat" or "time" charters[21]—a glaring omission since "the only means whereby the plaintiff's yacht could have been utilized for hire was through a bare boat charter." *Id.* at

[21] Under a "time charter" (also called a "voyage charter"), the crew and captain are hired along with the vessel. Under a "bareboat charter," the charterer hires the boat and then separately retains his own captain and crew.

554.[22] As a result, the court felt that the agreements, "if they ha[d] any evidentiary value at all, [we]re more consistent with an attempt to supply evidence in support of plaintiff's attempt to avoid the payment of the Florida Sales Tax upon this transaction." *Id.*

*Finkel* is irrelevant here for one (rather obvious) reason: it was decided *after a trial on the merits*. The *Finkel* Court thus had the opportunity to weigh the evidence and to assess the various witnesses' credibility—an assessment that, as we've seen, redounded very much to the plaintiff's detriment.[23] As we've suggested, our trial *may* yield similar results. But that's a question for another day. For now (again), we cannot weigh the witnesses' credibility or balance the evidence, *see McCormick*, 333 F.3d at 1240 n.7, because, at "summary judgment, if there is conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable

---

[22] The court found that the plaintiff's yacht "was licensed by the Bureau of Customs [ ]as a private pleasure yacht . . . and was thereby prohibited from transporting or carrying passengers for hire," except "through a bare boat charter." *Id.* at 554.

[23] *Finkel* also differs from our case in two *other* important ways. *First*, since the boat was delivered to the plaintiff in "new yacht condition," the plaintiff couldn't rely on any prior history of chartering it. 316 F. Supp. at 554. Here, by contrast, *both* Leonardo and Jeff Jacobson, PII's accountant, specifically testified that PII's been chartering the Vessel since at least 2014, *see, e.g.*, Ex. A, Leonardo Decl. [ECF No. 113-1 at 2–4] ¶¶ 6–10; Ex. B, Jacobson Decl., [ECF No. 113-1 at 15–17] ¶¶ 8–12—testimony PII corroborated, at least to some extent, with documentary evidence, *see* Jacobson Decl., Ex. 1 (PII Profit and Loss Statement) at 19–20; PII Schedule C Tax Returns 2012–2018 [ECF No. 112-1]; PII General Ledger 2014–2018 [ECF No. 112-4] at 46, 101, 228 (reflecting charter activity). *Second*, the *Finkel* yacht was licensed with the Bureau of Customs as a private pleasure yacht—and thus could only be hired for bareback charters. 316 F. Supp. at 554. Our Yacht, however, is endorsed for *both* "recreation" and limited "coastwise trade." *See* Certificate of Documentation [ECF No. 105-1] at 1–2. Since the parties don't make much of this latter designation, we'll assume, for today's purposes at least, *both* that the noun "coastwise trade" carries its accepted legal definition—"[c]ommerce among different coastal ports or navigable rivers of the United States, in contrast to commerce carried on between countries," *Coastwise Trade*, BLACK'S LAW DICTIONARY (10th ed. 2014)—*and* that the standalone adjective "coastwise" bears its common meaning—"engaged in commerce between places on a coast," *Coastwise*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABR. (1993). Our Vessel, thus, is available for more than just pleasure.

inferences must be drawn in his favor[,]" *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).[24] *Finkel*, then, doesn't help the Defendants here.

**5. The Lack of Charter Evidence**

*Fifth*, the Defendants (in Reply) contend that "the payments received by MY. P.I.I. LLC's ('MYPI') from RES Exhibit Services, LLC ('RES') are not associated in any way with the amounts allegedly 'charged' for charter of the motor yacht Pure Insanity." Reply at 1. According to the Defendants, PII's general ledgers "show a credit paid by RES that offsets all of MYPI's operating expenses, such as crew wages, repair costs, insurance premiums, legal fees, and staff meals." *Id.* at 2. The upshot, the Defendants say, is that "the ledgers fail to indicate how any expense listed is related to chartering the vessel. In fact, Leonardo agreed that for all years of charter, not one time has RES ever made a single payment for the exact cost amount listed in the 'charter activity' charts used for tax purposes." *Id.* If true, this all sounds devastating for PII. But, for two reasons, it doesn't entitle the Defendants to summary judgment here. *One*, the Defendants only advanced this argument for the first time in their Reply, *see generally* Motion; Reply at 1–3—which is why PII hasn't had a chance to rebut it. And it's well-established that "[a]rguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." *In re Egidi*, 571 F.3d at 1163; *see also Rankin v. Celebrity Cruises, Ltd.*, 489 F. App'x 362, 362 n.1 (11th Cir. 2012) ("[T]he law of this circuit is clear that arguments which are first raised in a reply brief are deemed waived."). *Two*, while this new argument (if true) *might* eliminate *most* of PII's loss-of-use damages, it wouldn't touch the damages PII allegedly sustained when Nassar took his business elsewhere.[25]

---

[24] *Cf. Stein*, 881 F.3d at 857 ("A district court is, after all, permitted to assess credibility and weigh evidence at a bench trial, and the same goes for the jury when it is the trier of fact.").

[25] Assuming, of course, that the whole Nassar-was-going-to-rent-my-boat episode actually happened—something we'll have to wait for trial to unravel.

In short, the Defendants' Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's claim for loss-of-use damages.

**II. Loss of Crew's Wages**

PII seeks reimbursement for the money it paid as crew's wages while the Yacht was out of the water. *See* Am. Compl. ¶¶ 15–44. To this, however, it is not entitled.

To recap the legal framework: the "contract rate for rental of the vessel is a proper guide for measuring the lost income of the shipowner." *Skou*, 478 F.2d at 347. "From a gross charter price must be subtracted the ordinary expenses the shipowner would incur in earning that gross fee." *Id.* at 348. But when (as here) "the shipowner makes no savings of operating expenses during repairs the charter price is an adequate measure of damage." *Id.* In other words, the plaintiff may not recover *both* the gross charter price *and* its operating expenses because, to reimburse the plaintiff for wages it would've paid anyway, would be to gift the plaintiff an undeserved windfall.

And there's no dispute that the crew's wages in our case were a fixed cost. *See, e.g.*, Downing Depo. [ECF No. 105–4] at 22:11–14 ("Q: Is the pay of the crew the same regardless of whether, week to week, that the vessel is chartered or not? A: Yes."). Leonardo himself admitted that PII would've had to pay precisely the same amount of money in crew's wages whether the Yacht was in the water or under repairs. Leonardo 4/27/2020 Depo. at 180:13–17 ("Q: So the fact of the matter is that the crew wages that you pay from March through September of 2019 would have been the exact same crew wages that you would have paid had this shaft never been cut, correct? A: Correct."). And, since they were being paid, the crew stayed with, and worked on, the Yacht *both* during charters *and* while it was being repaired. *See* Plaintiff's SOF ¶ 17 ("Admitted that the crew is paid the same regardless of

whether, week to week, the Vessel is chartered or not. Because the Defendants didn't *cause* the Plaintiff to pay the crew any extra wages, the Plaintiff cannot recover those wages here.[26]

Trying to parry this result, the Plaintiff advances a new argument. The fixed nature of the crew's wages is irrelevant, it now says, because it "did not receive the same value from the crew due to the Vessel being laid up on the hard." Response at 15. As should be clear already, this argument suffers from (at least) three major deficiencies.

*First*, this (new) damages calculation—the amorphous delta between the value of the crew's services on charters and the value of those (diminished) services on land—appears nowhere in the Amended Complaint. *See generally* Am. Compl. To the contrary, when it comes to the crew's wages, the Amended Complaint unambiguously requests only one thing: reimbursement for the *full amount* of those wages. Am. Compl. ¶¶ 15, 20, 24, 30, 35, 40, 44 (repeatedly requesting damages for "Captain & Crew Salaries: $160,527.42"). The natural inference, of course, is that the Amended Complaint sought no other form of reimbursement for the value of the crew's services. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)."). And it's by now well-settled that a party may not amend its complaint in response to a motion for summary judgment. *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment. At the summary judgment stage, the proper procedure for plaintiffs to assert a

[26] The Plaintiff never responds to this basic causation argument, *see* Response at 15, which the Defendants unmistakably advanced in their Motion, *see* Motion at 7. They have thus waived any argument they might've had. *See Transamerica Leasing, Inc. v. Institute of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001) ("Underwriters failed to raise this argument in response to Transamerica's motion for summary judgment. Therefore, the Underwriters have waived any argument that Transamerica's purported failure to disclose material information requires voidance of the policy.").

new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." (cleaned up)); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996))).

*Second*, the Plaintiff has adduced absolutely no evidence from which a reasonable trier of fact could compute the value of this new form of damages. It never, in other words, explains how one would go about calculating the difference between what the crew's services were worth during charters and what those services were worth while the Yacht was being repaired. So, for instance, it gives us no expert opinion, submits no documents, and provides no lay testimony—from the crew members or anyone else—for its position that there was (as a matter of fact) any salient difference between what the crew members did while the Vessel was chartered and the services they performed on land. Instead, it simply assures us, in the most conclusory way, that "the crew was not able to perform all of its normal duties while the Vessel was laid up on the hard and therefore the value of services received was not the same as if the Vessel had not been damaged." Ex. A, Leonardo Decl. [ECF No. 113-1 at 2–4] ¶ 15. But, "to survive summary judgment, the plaintiff must adduce *some* evidence of damages." *A&E Adventures LLC, v. Intercard, Inc.*, 2021 WL 1165244, at *1 (S.D. Fla. Mar. 26, 2021); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323 (M.D. Fla. 2016), *aff'd*, 703 F. App'x 814 (11th Cir. 2017) ("In order to survive [the defendants'] Motion for Summary Judgment, [the plaintiff] must point to evidence sufficient to allow a jury to reasonably find that it incurred actual damages[.]"); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, 2015 WL 3905018, at *33 (S.D. Fla. June 25, 2015) (granting summary judgment where the plaintiff "failed to provide any evidence of actual damages despite a protracted and ample discovery period"); *cf. State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1310 (S.D. Fla. 2018) ("The proof may be indirect and it may include estimates based on assumptions, so

long as the assumptions rest on adequate data." (quoting *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985))).

*Third*, as the Defendants point out in their Reply—and as we've already explained—a Vessel's fixed costs, like the crew's wages here, are not included when calculating damages for loss of use. *See* Reply at 7; *see also The Conqueror*, 166 U.S. at 133; *Skou*, 478 F.2d at 347. Even the Plaintiff's accountant agrees. *See* Bruckel Depo. at 36:2–36:11 ("A: The los[t] profit would be – generally would be the los[t] revenue less the marginal cost. Or the cost that would not otherwise have been incurred had you not had to rent the boat. Q: Right. Okay. And the fixed cost would not be included in that calculation, right? Because that's costs that would have been incurred regardless of whether the vessel was chartered or not, right? A: Sure."). And, since no one disputes that the crew's wages are fixed costs, the Defendants' Motion is **GRANTED** as to the Plaintiff's claim for wages.

***

After careful review, the Court hereby **ORDERS and ADJUDGES** as follows:

1. The Defendants' Motion for Summary Judgment [ECF No. 105] is **GRANTED in part and DENIED in part** as follows:
    a. The Motion is **GRANTED** as to the Plaintiff's wages claim.
    b. The Motion is **DENIED** as to the Plaintiff's claim for loss-of-use damages.
2. Within **seven days** of this Order, the parties shall submit a joint pre-trial stipulation, exhibit lists, witness lists, deposition designations, and proposed findings of fact and conclusions of law, and shall file any motions *in limine* (but not motions to exclude expert testimony under *Daubert*). Each party is limited to filing one motion *in limine*, which may not, without leave of Court, exceed the page limits allowed by the Local Rules. The parties are reminded that motions *in limine* must contain the Local Rule 7.1(a)(3) certification.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 11th day of June 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record